O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANDIDO MAREZ, <br><br> Plaintiff, <br><br> vs. <br><br> STEVEN BASSETT (in his individual capacity); RONALD DEATON (in his individual capacity); RALPH ESHOM (in his individual capacity); THOMAS C. HOKINSON (in his individual capacity); ARNOLD E. NETKA, (in his individual capacity); COREY PETERSON (in his individual capacity); DEPARTMENT OF WATER AND POWER; DOES 1-10, <br><br> Defendants. | Case No2:06-cv-00118-FMC-RCx <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter is before the Court on Defendants' Motion for Summary Judgment (docket no. 43), filed on March 17, 2008. The Court has read and considered the moving, opposition and reply documents submitted in connection with the Motion. The Court deems the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); Local Rule 7-15. Accordingly, the hearing set for April 14, 2008 is removed from the Court's calendar. For the reasons and in the manner set forth below, Defendants' Motion is GRANTED.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This is an action for damages for violations of 42 U.S.C. § 1983, as well as declaratory and injunctive relief. Plaintiff, Candido Marez ("Marez"), was a contractor for the supply of various materials to agencies of the City of Los Angeles, including Defendant Department of Water and Power ("DWP"). He operated through his own company, Montrose Supply ("Montrose"), which he formed in 1977 and sold in May of 2007. (Pl.'s Stmt. of Genuine Issues ¶ 6.)

Prior to 2004, the majority of Marez's purchase orders were "subpurchase orders" ("SPOs") from individual DWP "storekeepers." (*Id.* at ¶ 16.) SPOs are only authorized for purchases of less than $1000. (Netka Decl. ¶ 4; Defs.' Ex. 12.) Also, they are not permitted for "supplies or routine services covered by city contracts or purchases of materials and supplies maintained in city stores." (*Id.*) These items must be procured through the regular, competitive bidding process.

In August 2003, DWP began an internal investigation into the activities of Luciano Yi, a Storekeeper at DWP Store 2, where Montrose did a substantial amount of business. (Netka Decl. ¶ 3.)[1] The investigators discovered that Yi and others were engaging in the practice of "splitting" SPOs—i.e., using multiple SPOs for exactly the same items, the total costs of which greatly exceeded the $1000 threshold. (Netka Decl. ¶ 5.) Many of these "split" SPOs were for goods supplied by Marez and Montrose, including, but not limited to, tents and fans. (Defs.' Ex. 1.)

In February 2004, while the DWP's investigation into the purchasing activities at Store 2 continued, the Mayor and City Council appointed Marez to the City's Small Business Advisory Committee. Marez was then appointed as

---

[1] Store 2 is a DWP warehouse for general consumable merchandise, including janitorial supplies, restroom supplies and housekeeping equipment.

co-chair of the Mega-Contracts Sub-Committee. (Pl.s' Stmt. of Genuine Issues ¶ 8.) In his capacity as Committee co-chair, Marez, along with other small business owners, appeared at an April 2004 City Council meeting to discuss concerns about a particular DWP janitorial supplies contract and its negative effect on small businesses. Marez made subsequent appearances before the City Council where he was also critical of DWP practices. (Pl.'s Stmt. of Genuine Issues ¶ 11; Pl.'s Exs. 3-4, 10.)

In the interim, in March 2004, DWP assigned Defendant Arnold Netka ("Netka"), to oversee the management of Store 2. (Netka Decl. ¶ 3.) Netka looked into the allegations against Yi and others and proceeded to undertake "reforms" with respect to purchasing procedures. (*Id.* at ¶ 6.) For example, on April 27, 2004, he issued a memorandum informing DWP vendors that they could no longer meet informally with individual storekeepers, but rather had to make appointments through the Senior Storekeeper. (*Id.*; Defs.' Ex. 2.) In addition, together with Co-Defendant Steven Bassett, Netka began a process of training personnel and vendors about the purchase process, including the need to utilize competitive bidding procedures rather than SPOs for serial purchases of the same items. (Netka Decl. ¶ 7; Bassett Decl. ¶ 9.)

Following these reforms, Montrose's revenues from SPOs dropped, but its revenues from participation in competitive bidding increased. (Pl.'s Stmt. of Genuine Issues ¶ 18.) Marez had no problem obtaining information to facilitate his bids and admits that bidding opportunities were "always available." (*Id.* at ¶ 17; *see also* Defs.' Ex. 10, Marez Depo. 188-91 (discussing numerous bids won by Marez).) Indeed, during the six calendar years of 2001 through 2006, Montrose averaged $382,318 in annual revenues from DWP. Specifically, Montrose received revenues of $284,668 in 2001; $394,298 in 2002; $512,870 in

2003; $332,784 in 2004; $383,013 in 2005; and $386,275 in 2006. (Pl.'s Stmt. of Genuine Issues ¶ 19.)

Nevertheless, Marez maintains that his relationship with DWP deteriorated after he spoke out at the April 2004 City Council meeting and that he suffered a loss of profits in the wake of Netka and Bassett's purchasing reforms. He further believes that Defendants' conduct has deprived him of the rights, privileges and immunities secured to him by the First Amendment of the United States Constitution by deterring him from engaging in future speech. On that belief, he filed this lawsuit for (1) violations of 42 U.S.C. § 1983 (individual and *Monell* liability); and (2) declaratory and injunctive relief (under the California Government Tort Claims Act).

In his Opposition to the present motion for summary judgment, Marez agrees to dismiss his claims for declaratory and injunctive relief, leaving only the § 1983 claims for consideration by the Court.

## STANDARD OF LAW

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.; see also Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210

F.3d 1099, 1106 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its burden of persuasion at trial."). If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *see also Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006) ("Material facts are those which may affect the outcome of the case.") (internal citations omitted). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31; *see also Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492-93 (9th Cir. 1995). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

**DISCUSSION**

Marez's § 1983 First Amendment retaliation claims against DWP and the individual Defendants are analyzed under the standard framework for such claims, notwithstanding his status as an "independent contractor." *Alpha Energy Savers,*

*Inc. v. Hansen,* 381 F.3d 917, 923 (9th Cir. 2004) ("When a business vendor operates under a contract with a public agency, we analyze its First Amendment retaliation claim under § 1983 using the same basic approach that we would use if the claim had been raised by an employee of the agency.") (citing *Bd. of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 684-85, 135 L. Ed. 2d 843, 116 S. Ct. 2342 (1996)). Accordingly, Marez must establish that (1) he engaged in expressive conduct that addressed a matter of public concern; (2) the government agency (DWP) took an adverse action against him; and (3) his expressive conduct was a substantial or motivating factor for the adverse action. *Id.* (citing *Roe v. City of San Diego*, 356 F.3d 1108, 1112 (9th Cir. 2004)).

In their Motion, Defendants assert, *inter alia,* that Marez has no evidence that he in fact suffered any adverse action as a result of voicing his criticisms of DWP practices to the City Council. The Court agrees.

As Marez himself admits, he continued to have access to numerous bidding opportunities with DWP, from the time he engaged in his protected speech activities through the time at which he sold his company. More importantly, he was actually awarded a large number of contracts pursuant to the bidding process, such that he remained a top vendor of the Department. *Compare Alpha Energy,* 381 F.3d at 923 (aggrieved vendor received "only two of the 1,004 jobs" awarded during the relevant time period). Finally, any "lost profits" are clearly attributable to the shift in DWP purchasing practices from split-SPOs to competitive bidding, as the evidence reflects that Montrose was charging significantly higher prices for its goods when it was not required to compete with other vendors. For example, before they were subject to competitive bidding, Montrose/Marez were selling "E-Z up tent" shelters for $149 each. After the products were put up for competitive bid, the price per unit dropped

to $106.50. (*See* Defs.' Ex. 10, Marez Depo. 116:5-8.)[2]

Perhaps recognizing the weakness of his position, Marez now advances the argument that Netka's purchase procedure reforms themselves were not legitimate measures, but rather premeditated attempts to destroy Marez. This argument is not only unsupported by the evidence, but also entirely illogical. More importantly, Marez concedes that Netka's reforms affected all vendors equally (Marez Depo. 207), such that Marez cannot identify any individualized injury that would have been reasonably likely to deter him from engaging in further protected speech activity. *See Coszalter v. City of Salem,* 320 F.3d 968, 976 (9th Cir. 2003) (adverse action is measured by whether it is "reasonably likely to deter" the future exercise of First Amendment rights).

Indeed, Marez's only significant evidence of individual injury concerns a June 2004 bid for "E-Z up tents," to which the parties devote an exorbitant amount of discussion. Marez originally came in with the lowest price; however, the bid was subsequently canceled, ostensibly due to vendor confusion about the desired product. (Marez Depo. 118; Netka Decl. ¶ 10.) When the bid was re-issued, another vendor, CalOlympic Safety ("CalOlympic"), was awarded the contract. (Netka Decl. ¶ 10.) However, the goods provided by CalOlympic failed to meet the requisite standards for fire resistance, an issue that came to light only after Marez publicly complained. (Netka Decl. ¶ 11; Pl.'s Exs. 3-4.) Nevertheless, DWP ultimately admitted the error, issued an apology, and awarded the contract to Marez/Montrose.

---

[2] Marez's explanation of the extreme price differentials as a factor of the total quantity of goods ordered is unpersuasive. The evidence reflects that Marez was selling large quantities of goods through the SPO process as well—only the orders were "split" to avoid the $1000 threshold. (Defs.' Ex. 1.). To this end, the Court need not even consider the data compiled in Defendants' Exhibits 4,5,6,7 and 8 and the statements in the Netka, Bassett and Feldmeier declarations regarding DWP's "overpayments" to Montrose, to which Marez's counsel vehemently objects.

(Marez Decl. ¶ 5; Netka Decl. ¶ 11.) Any injury to Marez was therefore *de minimis*.[3]

## CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (docket no. 43) is GRANTED. Defendants are directed to provide a Judgment for the Court's signature, within ten (10) days.

IT IS SO ORDERED.

April 11, 2008

_____

FLORENCE-MARIE COOPER, Judge

UNITED STATES DISTRICT COURT

---

[3] Marez's additional references to sporadic incidents of harassment or verbal threats are also insufficient and/or too attenuated to constitute actionable "adverse action."

8